**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------- X

KAITLIN PACE, D.V.M.,                                        :

                                                  :

                      Plaintiff,        :

                                                  :

              v.        :

                                                  :

TOWN AND COUNTRY VETERINARY         :

CLINIC P.C., MICHAEL HEBERT, and         :

SAMANTHA SOUSA, in their individual and         :

professional capacities,         :

                                                  :

                    Defendants.        :

----------------------------------------------------------X

Civil Case No.:

20-cv-00279 (GLS)(ML)

 

# PLAINTIFF KAITLIN PACE, D.V.M.'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

**WIGDOR LLP**

Michael J. Willemin
Christine L. Hogan

85 Fifth Avenue
New York, NY 10003
Telephone: (212) 257-6800

*Counsel for Plaintiff*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. iii

PRELIMINARY STATEMENT ........................................................... 1

STATEMENT OF FACTS ................................................................... 4

    I.        Background .................................................................... 4

    II.      Within One Month of Finding Out About Dr. Pace's Need for Extra Breaks, Upper Management Cuts Dr. Pace's Pay ................................... 5

    III.     Dr. Pace Complains About Pregnancy Discrimination and Within One Week Suffers Additional Retaliation ................................... 5

    IV.     Dr. Pace's Need for Pregnancy-Related Accommodations Leads to Her Suspension and Eventual Termination .................................... 6

ARGUMENT ...................................................................................... 9

    I.        Summary Judgment Standard ...................................... 9

    II.      The Court Should Deny Summary Judgment on Dr. Pace's Retaliation Claims Under Title VII and the NYSHRL ................................... 9

           A.     Dr. Pace Satisfies All Elements of Her Prima Facie Case ......................... 10

                1.     Dr. Pace Participated in Protected Activity on Five Occasions ............................................................. 10

                        i.      The Mid-September 2019 Request for Breaks .................. 11

                        ii.     The October 16, 2019 Email ............................... 11

                        iii.    The October 21, 2019 Email ............................... 14

                        iv.    January 2, 2020 Formal Request for Accommodations ............................................. 15

                        v.     January 10, 2020 Email Requesting to Come Back to Work with Accommodations ......................... 15

                2.     Defendants Knew of Dr. Pace's Protected Activity .................. 15

                3.     Dr. Pace Experienced Six Adverse Actions ................................... 15

i

        4.      The Evidence of a Causal Connection is Substantial....................16

    B.     There is Abundant Evidence of Pretext ......................................................18

III.     The Court Should Deny Summary Judgment on Dr. Pace's Claims for Economic Damages Under Title VII and the NYSHRL........................................23

CONCLUSION...................................................................................................................25

## <u>TABLE OF AUTHORITIES</u>

<u>**Cases**</u>

*Brooks v. City of Utica*,
   275 F. Supp. 3d, 370 (N.D.N.Y. 2017) ................................................................................. 11

*Abboud v. Cty. of Onondaga, New York*,
   341 F. Supp. 3d 164 (N.D.N.Y. 2018) ........................................................................... 10, 20

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) ..................................................................................................................... 9

*Antoine v. Brooklyn Maids 26, Inc.*,
   489 F. Supp. 3d 68 (E.D.N.Y. 2020) ............................................................................ 23, 24

*Bader v. Special Metals Corp.*,
   985 F. Supp. 2d 291 (N.D.N.Y. 2013) ........................................................................... 15, 16

*Byrnie v. Town of Cromwell, Bd. of Educ.*,
   243 F.3d 93 (2d Cir. 2001) ....................................................................................................... 18

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986) ..................................................................................................................... 9

*Chisholm v. Mem'l Sloan-Kettering Cancer Ctr.*,
   824 F. Supp. 2d 573 (S.D.N.Y. 2011) ................................................................................... 23

*Cortes v. MTA New York City Transit*,
   802 F.3d 226 (2d Cir. 2015) ....................................................................................................... 9

*Crawford v. Metro Gov't of Nashville & Davidson Cnty., Tenn.*,
   555 U.S. 271 (2009) ................................................................................................................... 10

*Dailey v.* Societe *Generale*,
   108 F.3d 451 (2d Cir. 1997) ................................................................................................... 23

*D'Amore v. City of N.Y.*,
   No. 17 Civ. 1748 (PKC) (ST), 2019 WL 2571157 (E.D.N.Y. June 21, 2019) ................ 13

*Epstein v. Kalvin-Miller Int'l, Inc.*,
   No. 96 Civ. 8158, 2000 WL 1761052 (S.D.N.Y. Nov. 29, 2000) ................................... 23

*Farmer v. Shake Shack Enterprises, LLC*,
   473 F. Supp. 3d 309 (S.D.N.Y. 2020) ................................................................................... 11

*Farrell v. Planters Lifesavers Co.*,
    206 F.3d 271 (3d Cir. 2000) ............................................................................ 18

*Gorzynski v. JetBlue Airways Corp.*,
    596 F.3d 93 (2d Cir. 2010) .............................................................................. 9

*Gratton v. Jetblue Airways*,
    No. 04 Civ. 7561 (DLC), 2005 WL 1251786 (S.D.N.Y. May 25, 2005) ................ 11

*Gregory v. Daly*,
    243 F.3d 687 (2d Cir. 2001) ............................................................................ 16

*Hall v. Fam. Care Home Visiting Nurse & Home Care Agency, LLC*,
    No. 3:07 Civ. 0911 (JCH), 2010 WL 1487871 (D. Conn. Apr. 12, 2010) .............. 24

*Hicks v. Baines*,
    593 F.3d 159 (2d Cir. 2010) ............................................................................ 16

*Jackson v. N.Y. City Transit*,
    348 Fed. App'x 666 (2d Cir. 2009) .................................................................. 10

*Johnson v. Strive E. Harlem Emp. Grp.*,
    2014 WL 25666 (S.D.N.Y. Jan. 2, 2014) .......................................................... 23

*Lawrence v. Nat'l Westminster Bank New Jersey*,
    98 F.3d 61 (3d Cir. 1996) ............................................................................... 19

*Lenzi v. Systemax, Inc.*,
    944 F.3d 97 (2d Cir. 2019) ............................................................................. 10

*Magill v. Precision Sys. Mfg.*,
    No. 5:01 Civ. 1482, 2006 WL 468212 (N.D.N.Y. Feb. 27, 2006) ........................ 16

*Malena v. Victoria's Secret Direct, LLC*,
    886 F. Supp. 2d 349 (S.D.N.Y. 2012) ............................................................. 10

*McDonnell Douglas Corp. v. Green*,
    411 U.S. 792 (1973) ........................................................................................ 9

*McNair v. NYC Health & Hosp. Co.*,
    160 F. Supp. 2d 601 (S.D.N.Y. 2001) ............................................................. 16

*Moore v. City of New York*,
    745 F. App'x 407 (2d Cir. 2018) ..................................................................... 14

*Pellegrini v. Sovereign Hotels, Inc.*,
    740 F. Supp. 2d 344 (N.D.N.Y. 2010) .......................................................................... 9, 10, 19

*Quinn-Nolan v. Schulte, Roth & Zabel*,
    No. 00 Civ. 7936 (SHS), 2002 WL 1758920 (S.D.N.Y. July 30, 2002) ................................ 24

*R.B. Ventures, Ltd. v. Shane*,
    112 F.3d 54 (2d Cir. 1997) ................................................................................................... 9

*Reeves v. Sanderson Plumbing Prod., Inc.*,
    530 U.S. 133 (2000) .......................................................................................................... 18

*Richardson v. New York State Off. of Mental Health*,
    No. 6:11 Civ. 1007 (GLS)(ATB), 2014 WL 3818928 (N.D.N.Y. Aug. 4, 2014) ................. 19

*Sharpe v. MCI Comm'ns Servs., Inc.*,
    684 F. Supp. 2d 394 (S.D.N.Y. 2010) ............................................................................... 13

*Tegler v. Glob. Spectrum*,
    291 F. Supp. 3d 565 (D.N.J. 2018) ................................................................................... 20

*Thomas v. iStar Fin.*,
    508 F. Supp. 2d 252 (S.D.N.Y. 2007) ............................................................................... 23

*Treglia v. Town of Manlius*,
    313 F.3d 713 (2d Cir. 2002) .............................................................................................. 10

*Van Brunt-Piehler v. Absolute Software, Inc.*,
    504 F. Supp. 3d 175 (W.D.N.Y. 2020) ......................................................................... 14, 15

*Walsh v. New York City Hous. Auth.*,
    828 F.3d 70 (2d Cir. 2016) ................................................................................................... 9

*Weiss v. JP Morgan*,
    332 F. App'x 659 (2d Cir. 2009) .................................................................................... 19, 21

*Woodman v. WWOR–TV, Inc.*,
    411 F.3d 69 (2d Cir. 2005) ................................................................................................ 10

*Zakre v. Norddeutsche Landesbank Girozentrale*,
    541 F. Supp. 2d 555 (S.D.N.Y. 2008) ............................................................................... 23

Plaintiff Kaitlin Pace, D.V.M. submits this memorandum of law in opposition to the motion for summary judgment filed by Defendants Town and Country Veterinary Clinic P.C. (the "Clinic"), Michael Hebert, and Samantha Sousa.

## PRELIMINARY STATEMENT

If any party should be moving for summary judgment in this action, it is Dr. Pace. Indeed, Dr. Pace was terminated on January 13, 2020, only *eleven days* after submitting a doctor's note detailing pregnancy-related accommodations and *ten days* after she was suspended without pay and told by one of her managers, Ms. Sousa, that her only choices were to return to work without any restrictions or go out on disability leave – so much for the legally required "interactive process."  This January 3, 2020 meeting was memorialized by Ms. Sousa in a memorandum that confirmed Defendants' unlawful ultimatum – a memorandum that Ms. Sousa later edited in an obvious attempt to sanitize the conversation and conceal illegal retaliation.

During this January 3, 2020 meeting, Ms. Sousa also confirmed to Dr. Pace that Defendants had arranged coverage for her shifts while she was suspended without pay.  As a result, Dr. Pace did not go to work the following week as she sought to figure out how to respond.  Defendants, of course, knew that Dr. Pace would not be coming to work (and no one, at any time, called to inquire as to Dr. Pace's whereabouts when she did not arrive at work the following days).  To the contrary, the only communications Dr. Pace received were messages from Ms. Sousa which read: "How are you doing?  I am really sorry about this" (on January 8, 2020) and "Do you have an idea of what you are going to do" (on January 10, 2020).

On January 10, 2020, Dr. Pace sent an email to another one of her managers, Mr. Hebert, in which she explained that she could not come back to work unless she were granted accommodations (particularly, her breaks).  Defendants do not argue, nor could they, that this

1

request was unreasonable.  Yet, just three days later, and with no warning whatsoever, Defendants retaliatorily fired Dr. Pace.  Outrageously, the purported basis for Dr. Pace's termination was that she had failed to appear for work following her suspension.  This is preposterous.  As noted above, Defendants told Dr. Pace that she was not permitted to work and, knowing that she was going to be out of work, no one ever called her to ask why she had not shown up during that week.

In order to "shore up" an explanation for Dr. Pace's termination, Defendants also falsely stated that Dr. Pace had violated the Clinic's patient data entry policies – she had not.  Moreover, Defendants knew about these alleged policy violations when Ms. Sousa, on January 10, 2020, asked Dr. Pace what she intended to do with respect to a return to work.  These alleged violations obviously were not a cause of Dr. Pace's termination – if they were, Ms. Sousa would not have texted Dr. Pace about her return to work.  It was only after Defendants received Dr. Pace's January 10, 2020 email, which plainly constitutes (yet another instance of) protected activity, that it terminated her employment.

To be sure, Dr. Pace's retaliatory termination was only the last in a series of discriminatory and retaliatory events following the disclosure of her pregnancy and request for accommodations in September 2019.  Up until that time, Dr. Pace, a well-respected and accomplished veterinarian with a decade of relevant experience, had performed exceedingly well after being recruited to join the Clinic in March 2018.  This performance is evidenced by a $25,000 raise that Dr. Pace received in March 2019 in recognition of her hard work and success. She was also slated to eventually become a 20% owner of the Clinic.

All of that changed when Dr. Pace announced her pregnancy in September 2019 and expressed her need for accommodations.  First, within a month of her protected activity – the

first (informal) accommodation request – she was turned into an hourly employee because Defendants did not want to pay Dr. Pace her full salary upon learning that she would need to take very brief periodic breaks.  This resulted in a pay cut.  Second, after Dr. Pace complained in writing on October 16, 2019 that she "***couldn't help feeling a bit discriminated against,***" absolutely no investigation was conducted into her concerns.  Third, after Dr. Pace's October 16, 2019 complaint, her managerial responsibilities were revoked.  She was also subjected to disparate timekeeping micromanagement before ultimately being suspended and fired.

The simple fact is that Dr. Pace engaged in protected activity on at least five occasions and suffered direct, timely retaliation after each such occasion.  Moreover, Defendants' retaliatory animus is well-documented, including in Ms. Sousa's own writings and statements by Ms. Sousa and Mr. Hebert, which constitute admissions of pregnancy discrimination.  Add to that the utterly incredible explanation for Dr. Pace's termination and there is way more than enough evidence of retaliatory animus to send this case to a jury.

Finally, Defendants attempt to bar Dr. Pace from seeking damages on account of an alleged failure to mitigation is both misdirected (*i.e.*, it should, by law, be directed to a jury) and misguided (*i.e.*, Dr. Pace promptly made reasonable efforts to mitigation and continues to do so). The reasonableness of Dr. Pace's efforts is further established given that Dr. Pace was pregnant at the time of her termination, which is a fact that courts and juries are permitted to – and do – consider in rendering decisions related to mitigation.  In short, promptly after being unlawfully terminated Dr. Pace found employment with the understanding that the position would evolve into a fulltime role – and it is, in fact, ramping up into a full-time role.  There is nothing unreasonable about that.

## STATEMENT OF FACTS[1]

### I.   BACKGROUND

Dr. Pace has been in the veterinary industry for over ten years.  She worked as a receptionist, veterinarian assistant, and veterinary technician from 2010 to 2014, got her doctorate in veterinary medicine in 2016, and worked as a veterinarian at other clinics until the Clinic recruited and hired her in March 2018.  (56.1 ¶ 64).

During the relevant time-period, the Clinic had four locations – Ogdensburg, Potsdam, Massena, and Greene.  (56.1 ¶ 65).  Upper management (Dr. John Zeh, owner; Jodie Bell, manager; and Mr. Hebert, manager) worked out of the Ogdensburg location.  (*Id.* ¶ 65).  Dr. Pace originally reported to Dr. Zeh, Ms. Bell, and Mr. Hebert, and then started reporting to Ms. Sousa, manager of the Greene location, in October 2019.  (*Id.* ¶ 8).

In August 2018, Dr. Pace transferred to the Greene location to be the only full-time veterinarian on staff.  (*Id.* ¶ 66).  In March 2019, Defendants awarded Plaintiff a $25,000 raise in order to award her performance.  (*Id.* ¶ 14).  Then, in August 2019, Dr. Pace found out that she was pregnant.  She immediately informed Ms. Sousa because: (1) she needed to take additional breaks; and (2) wanted to delay dental procedures until she received clearance from her doctor, as dentals involved the use of isoflurane gas.  (*Id.* ¶ 67).  Ms. Sousa did not report any of this to upper management and purposely did not place Dr. Pace's extra breaks in the scheduling system (which upper management could see in real-time), in order to hide them from upper management, as "they probably wouldn't be okay with that."  (*Id.* ¶ 68).

---

[1]     Dr. Pace respectfully refers the Court to Plaintiff's Counterstatement to Defendants' Local Rule 56.1 Statement of Material Facts ("56.1 Counterstatement"). Citations to the 56.1 Counterstatement are denoted by "56.1 ¶ __."

II.     **WITHIN ONE MONTH OF FINDING OUT ABOUT DR. PACE'S NEED FOR
        <u>EXTRA BREAKS, UPPER MANAGEMENT CUTS DR. PACE'S PAY</u>**

In mid-September 2019, Dr. Pace told upper management about her pregnancy, told them
she was taking occasional breaks, and asked that her surgical and appointment schedule be
lightened a bit when necessary.  (*Id.* ¶ 69).  Only around one month later, on October 15, 2019,
Defendants retaliated against Dr. Pace by changing her compensation structure from salaried to
hourly, which led to a loss in overall pay.[2]  (*Id.* ¶¶ 23, 70).  Although Mr. Hebert claimed that it
had to do with the Greene location's financial performance, this was a pretext – it had everything
to do with her pregnancy.  Mr. Hebert admitted to this during his deposition.  (*Id.* ¶ 72).  The
new compensation structure was set up this way so Defendants could pay Dr. Pace less if she
worked less in account of her pregnancy.  (*Id.* ¶¶ 23, 76-77).

III.    **DR. PACE COMPLAINS ABOUT PREGNANCY DISCRIMINATION AND
        <u>WITHIN ONE WEEK SUFFERS ADDITIONAL RETALIATION</u>**

The next day, on October 16, 2019, Dr. Pace, disturbed by the blatantly discriminatory
changes the Clinic made to her employment, emailed Mr. Hebert and complained that she felt
that she was being discriminated because she was pregnant.  (*Id.* ¶ 78).  Mr. Hebert responded
two days later.  He acknowledged Dr. Pace's complaint that the change in compensation
structure was related to her pregnancy, dismissed her concerns outright, and further retaliated
against her by removing her managerial responsibilities and giving them to Ms. Sousa, an
unmarried female employee with no children, who is not a veterinarian.  (*Id.* ¶¶ 79-80).

---

[2]     At that point, Dr. Pace's annual salary was $120,000, based on a 40 hour per week
workweek, which is equivalent to an approximate hourly rate of $57.70 per hour.  Mr. Hebert
initially offered Dr. Pace $52 per hour, which she was only able to negotiate up to $54 per hour.
Accordingly, the only way for Dr. Pace to make the same amount as she did previously was to
work approximately two additional (overtime) hours per week, even though she was pregnant
and in need of more breaks and less working time.  (56.1 ¶¶ 73-75).

On October 21, 2019, the first day Dr. Pace attended work as an hourly employee, Dr. Pace asked Ms. Sousa when she would be provided with an account for Paylocity, a computer software the Clinic uses to track employees' hours.  (*Id.* ¶ 81).   Ms. Sousa told her that Mr. Hebert had instructed her to keep track of Dr. Pace's hours instead of her using the Paylocity system, a clear departure from the Clinic's policy on timekeeping and an obvious ploy to scrutinize Dr. Pace's hours while she was pregnant.  (*Id.* ¶ 82).

In response, Dr. Pace sent a follow-up email to Mr. Hebert, complaining again of pregnancy discrimination.  (*Id.* ¶ 83).  Since Mr. Hebert had no way of explaining away this decision, he relented and gave Dr. Pace access to the Paylocity system.  (*Id.* ¶ 84).  Defendants never bothered to investigate Dr. Pace's complaints of discrimination.  (*Id.* ¶ 85).

## IV.   DR. PACE'S NEED FOR PREGNANCY-RELATED ACCOMODATIONS LEADS TO HER SUSPENSION AND EVENTUAL TERMINATION

As Dr. Pace's pregnancy progressed, she became more and more fatigued, which she shared with Ms. Sousa.  (*Id.* ¶¶ 86-87).  Meanwhile, upper management had been noticing gaps in Dr. Pace's schedule and began questioning Dr. Pace and Ms. Sousa about them.  Ms Sousa explained that she could no longer give Dr. Pace breaks "without them [upper management] knowing, that it had to be cleared with them, and, in order to do so, [Dr. Pace] had to produce a doctor's note proving that [she] needed them."  (*Id.* ¶ 88).

Accordingly, on January 2, 2019, Dr. Pace gave a generic doctor's note to Ms. Sousa, who then faxed it to the main office.  That is when upper management found out about Dr. Pace's need for breaks related to her pregnancy.  (*Id.* ¶ 89). The doctor's note stated:

> Due to [Dr. Pace's pregnancy], the above patient should not lift over 25 lbs, do any continuous strenuous activity, patient should take breaks every 2 hours as needed, and no prolonged standing. She should not be exposed to toxic chemicals or fumes. She also should not have any shaking or jarring movements. Patient is not to have

6

> any contact sports, or out in the heat for prolonged periods on [*sic*]
> time. These restrictions are for the remainder of her pregnancy.

(*Id.* ¶ 90).  In response, upper management ordered Dr. Pace to stop performing surgeries even though Dr. Pace informed them that her doctor had already cleared her for surgeries.  They did not order Dr. Pace from seeing patients otherwise.  (*Id.* ¶¶ 37, 91).

The next day, on January 3, 2020, Ms. Sousa visited the Ogdensburg location to discuss Dr. Pace and her pregnancy.  (*Id.* ¶ 92).  About an hour before she returned to the Greene office, Ms. Sousa called Dr. Pace and told her to wait at the office until she returned because she needed to speak with her.  (*Id.* ¶ 93).  Keenly aware of the discriminatory and retaliatory conduct to which she was being subjected by Defendants, Dr. Pace tersely joked to Ms. Sousa, "what is the punishment this time?"  Ms. Sousa did not respond to Dr. Pace's question.  (*Id.* ¶ 94).

After she returned to the Greene location at the end of the day, Ms. Sousa provided Dr. Pace with an ultimatum – Dr. Pace could come back to work without any restrictions or go out on full-time disability leave.  Ms. Sousa explained that "they felt they could not accommodate all of the things in the list and so there would not be any individual conversation about each particular concern."  (*Id.* ¶¶ 95-96).  In the meantime, Dr. Pace was to be suspended without pay. As she left, Ms. Sousa told Dr. Pace that her schedule was covered, which it was – from Saturday, January 4th through Thursday, January 9th.  (*Id.* ¶ 99).[3]

To be clear, Ms. Sousa and Ms. Bell had already obtained coverage for Dr. Pace for Saturday, January 4th through Thursday, January 9th by the time of the January 3, 2020 meeting. (*Id.* ¶¶ 48, 99).  Nevertheless, upper management started discussing Dr. Pace's termination for the pretextual reason of "no-call, no-show" as early as Tuesday, January 7th, (despite having

---

[3]     This version of the facts is supported by two drafts of a memorandum that Ms. Sousa wrote after the meeting, both of which confirm Dr. Pace's version of what happened. (*Id.* ¶ 97).

already obtained coverage for Dr. Pace and telling her she was suspended without pay).  (*Id.* ¶ 100).  The next day, on Wednesday, January 8th, Ms. Sousa texted Dr. Pace, "How are you doing?  I am really sorry about this," but did not bother to tell her that management was considering terminating her for no-call/no show.  (*Id.* ¶ 101).  In fact, no one ever contacted Dr. Pace to ask her where she was (demonstrating that they had no expectation that she would be in that week).  (*Id.* ¶ 102).

On Friday, January 10, 2020, Dr. Pace emailed Mr. Hebert about the two options given to her by Ms. Sousa during the January 3rd meeting:

> I am writing about the two options that were given to me on January 3, 2020.  I was told by Sam that I will not be allowed to work at Greene unless my doctor signs a note saying that I can work without any accommodations or restrictions.  My doctor will not be able to do this, as I do need the accommodations (particularly the brief periodic breaks) that were previously discussed.  The other option was for my doctor to sign a note saying that I am disabled and cannot work, which is not true.  If I cannot return to work without accommodations, I take it that I am terminated?  I would like to return but cannot without the accommodations.

(*Id.* ¶ 103).  No one bothered to respond to Dr. Pace's email (or even consider it).  (*Id.* ¶¶ 104-06).  Instead, only three days later, on Monday, January 13, 2020, Defendants fired Dr. Pace for reasons related to her pregnancy, complaints, and requests for accommodations.  (*Id.* ¶¶ 107-08).

Defendants claimed, in their termination letter, that their decision to terminate was based on (1) Dr. Pace "unprofessionally" leaving the January 3, 2020 meeting with Ms. Sousa, (2) her no-call/no-show from January 4 through 10, 2020, and (3) her failure to enter thirty-plus patient records into the electronic software.  None of these reasons, however, were legitimate or based in fact.  Dr. Pace did not end the January 3, 2020 meeting prematurely or unprofessionally.  She was not scheduled to work January 4th through January 10th – on January 3rd, Defendants had informed her of her suspension and had already covered her schedule.  And, the only reason Dr.

Pace did not enter the 30 plus records referenced in the letter is because she was abruptly suspended without pay.  It was neither "extremely unprofessional" nor had "the potential to interfere with" her vet license.  (*Id.* ¶¶ 109-113).

## ARGUMENT

## I.    SUMMARY JUDGMENT STANDARD

Summary judgment is a drastic remedy that is only appropriate where the moving party demonstrates that "there is no genuine issue as to any material fact" and, as a result, the moving party is entitled to judgment as a matter of law.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  On a motion for summary judgment, the district court must view all facts in the light most favorable to the nonmoving party and resolve any ambiguities and draw all inferences in favor of the nonmoving party.  *See Anderson*, 477 U.S. at 247; *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  "[T]he nonmovant must merely show that 'reasonable minds could differ as to the import of the evidence in the record.'"  *Cortes v. MTA New York City Transit*, 802 F.3d 226, 230 (2d Cir. 2015) (quoting *R.B. Ventures, Ltd. v. Shane*, 112 F.3d 54, 59 (2d Cir. 1997)).  Courts have "long recognized 'the need for caution about granting summary judgment to an employer in a discrimination case where, as here, the merits turn on a dispute as to the employer's intent.'"  *Walsh v. New York City Hous. Auth.*, 828 F.3d 70, 74 (2d Cir. 2016) (quoting *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 101 (2d Cir. 2010)).

## II.    THE COURT SHOULD DENY SUMMARY JUDGMENT ON DR. PACE'S RETALIATION CLAIMS UNDER TITLE VII AND THE NYSHRL

Retaliation claims under Title VII and the NYSHRL are analyzed under the three-part burden-shifting test set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973).  First, the plaintiff has the burden to establish a prima facie case of retaliation.  *Pellegrini v. Sovereign Hotels, Inc.*, 740 F. Supp. 2d 344, 354 (N.D.N.Y. 2010) (Sharpe, J.).  Once the

plaintiff does so, the burden shifts to defendants to set forth a legitimate, non-retaliatory reason for its actions. *Id.* Finally, the burden shifts back to the plaintiff to "demonstrate that defendants' proffered reasons for taking the employment actions were merely pretextual." *Abboud v. Cty. of Onondaga, New York*, 341 F. Supp. 3d 164, 183 (N.D.N.Y. 2018) (Sharpe, J.).

### A.   Dr. Pace's Satisfies All Elements of Her Prima Facie Case

"To establish a prima facie case of retaliation under Title VII, a plaintiff must show that '(1) [she] participated in a protected activity, (2) the defendant knew of the protected activity; (3) [she] experienced an adverse employment action; and (4) a causal connection exists between the protected activity and the adverse employment action.'" *Pellegrini*, 740 F. Supp. 2d at 354 (quoting *Jackson v. N.Y. City Transit*, 348 Fed. App'x 666, 669 (2d Cir. 2009)). "[T]he [plaintiff's] initial burden [is] 'minimal.'" *Pellegrini*, 740 F. Supp. 2d at 354 (quoting *Woodman v. WWOR–TV, Inc.*, 411 F.3d 69, 76 (2d Cir. 2005); *Treglia v. Town of Manlius*, 313 F.3d 713, 719 (2d Cir. 2002) ("A plaintiff's burden at this prima facie stage is de minimis.")).

### 1.   Dr. Pace Participated in Protected Activity On Five Occasions

What qualifies as "protected activity" is not limited to formal protests of discrimination. Rather, any expression of disapproval of employment discrimination is protected. *Crawford v. Metro Gov't of Nashville & Davidson Cnty., Tenn.*, 555 U.S. 271, 276-80 (2009). No "magic words" are required, so long as the employee is reasonably understood to be opposing discrimination. *Malena v. Victoria's Secret Direct, LLC*, 886 F. Supp. 2d 349, 363 (S.D.N.Y. 2012). The context and circumstances surrounding the complaint need to be considered when determining whether protected activity occurred. *Lenzi v. Systemax, Inc.*, 944 F.3d 97, 113 (2d Cir. 2019) ("Markou's email, read in context, is sufficient to meet her minimal burden . . . .").

Defendants argue that "it is apparent that the sole basis for Plaintiff's retaliation claims is her October 16, 2019 email to Mr. Hebert." (D. Br. at 12). This is wildly inaccurate. Dr. Pace

engaged in protected activity on at least five occasions: (1) in mid-September 2019, when she informed upper management of her pregnancy and need to take limited breaks; (2) in her October 16, 2019 email, where she complained about the change to her compensation structure; (3) in her October 21, 2019 email, where she asked to be treated the same as other hourly employees with respect to access to Paylocity; (4) by requesting formal accommodations for her pregnancy on January 2, 2020; and (5) in her January 10, 2020 email, where she expressed her desire to come back to work with accommodations.  (56.1 ¶¶ 67, 69, 78, 83, 89-90, 103).

i.      The Mid-September 2019 Request for Breaks

First, Dr. Pace's request for additional breaks upon telling upper management she was pregnant in mid-September 2019 constitutes protected activity.  (56.1 ¶ 69).  *See Farmer v. Shake Shack Enterprises, LLC*, 473 F. Supp. 3d 309, 331 (S.D.N.Y. 2020) (request for pregnancy accommodation was considered protected activity); *Gratton v. Jetblue Airways*, No. 04 Civ. 7561 (DLC), 2005 WL 1251786, at *10 (S.D.N.Y. May 25, 2005) (same).  As explained in *Brooks v. City of Utica*, "[a] reasonable person, "in the plaintiff's position, considering 'all the circumstances,'" would likely be dissuaded from engaging in protected activity if, after requesting a reasonable accommodation," it was not granted.  275 F. Supp. 3d 370, 380 (N.D.N.Y. 2017) (request for religious accommodation was considered protected activity).

ii.     The October 16, 2019 Email

Taking all inference in Dr. Pace's favor – as is required on summary judgment motion – the October 16th email also constitutes protected activity both on its face and when considering the surrounding context.  (56.1 ¶ 78).  Dr. Pace met with Mr. Hebert to discuss the Clinic's decision to change her from salaried to hourly, and Mr. Hebert specifically admitted that the

11

decision was related to her pregnancy.  (*Id.* ¶¶ 71-72).  Dr. Pace also testified that, while at the meeting, she believed that the decision was related to her pregnancy.  (*Id.* ¶ 78).

In response to the decision, Dr. Pace sent an email to Mr. Hebert the following day, which confirmed her belief that the compensation structure changed related to her pregnancy and not the financial reasons Mr. Hebert also gave her:

- "Well this change ***and the timing of it have been keeping me up much of the night***."

- "I understand that the number of appointments they are seeing in a day is generally greater than what we can do in [G]reene. But ***as we discussed, that is often based on*** short staff and ***my inability to carry 4-5 appointments an hour pregnant***. I know it was not the intention, but ***I couldn't help feeling a bit discriminated against*** for the moment – poor timing overall I suppose."

- "I have to say that while we were discussing this in person, it did not feel as though it was coming from a bad place. ***After letting it sit for a bit, it really started to feel like a bigger blow*** (which ***I know you were worried about***)."

- "***Again, the timing feels a little targeted*** as I have knowingly backed off on number of procedures, ***and some days I just do not feel well enough to see a 100% full schedule as pregnancy fatigue has been severe***."

(*Id.* ¶ 78 (emphasis added); *see also id.* ¶¶ 26-33).

And finally, Mr. Hebert certainly understood this email to be a continued complaint about unfair treatment related to her pregnancy, when he responded to Dr. Pace:

Perhaps this should have been address sooner but as I have already noted, we felt that this would correct itself – long before the pregnancy. ***I agree that we had talked about work and the pregnancy*** and as the fact that some days will be harder (and therefore less profitable) than others. ***As I have already stated, this decision has nothing to do with that.***

(*Id.* ¶ 32 (emphasis added)).

12

In their brief, Defendants provide various reasons as to why Dr. Pace's October 16, 2019 email does not constitute protected activity.  (D. Br at 12-17).  None are valid.

First, Defendants try to downplay Dr. Pace's explicit reference to discrimination and claim that she "fail[ed] to actually articulate the basis upon which she was allegedly discriminated."  (D. Br. at 14).  This is ludicrous.  Dr. Pace specifically stated that she felt "discriminated against," and connected the timing of the compensation decision to her pregnancy more than once in the email.  (56.1 ¶¶ 29, 33).  It is also reasonable that Dr. Pace would want to downplay her accusation of discrimination against Defendants, particularly because Ms. Sousa had already informed her that she was keeping the pregnancy accommodations a secret from management "because they probably wouldn't be okay with that."  (*Id.* ¶ 20).  Defendants' citation to *Sharpe v. MCI Comm'ns Servs., Inc.*, 684 F. Supp. 2d 394, 406 (S.D.N.Y. 2010), is inapposite because in that case, unlike here, the plaintiff did "not remember mentioning . . . discrimination in any of his complaints."  Similarly, *D'Amore v. City of N.Y.*, No. 17-CV-1748 (PKC) (ST), 2019 WL 2571157, at *7 (E.D.N.Y. June 21, 2019), is distinguishable because there, plaintiff admitted that he believed the adverse action was <u>not</u> due to his vague complaint that something seemed "improper," but to a host of other non-protected reasons.

Second, Defendants claim that "Plaintiff's own words indicate that she did not possess a good faith belief that she was being discriminated against."  (D. Br. at 14).  This is both an unreasonable read of the October 16th email for all the reasons noted above, and simply untrue – Plaintiff did believe she was being discriminated against.  (56.1 ¶¶ 33, 78).

Finally, Defendants argue that "no reasonable employer would construe Plaintiff's October 16th email as a complaint of pregnancy discrimination."  (D. Br. at 15).  It is clear from

13

Mr. Hebert's emailed response, however, that he did believe Dr. Pace was complaining about potential pregnancy discrimination.  (56.1 ¶ 33).

Defendants' reliance *Moore v. City of New York*, 745 F. App'x 407, 409 (2d Cir. 2018), and to the four successive cases in the string cite (*see* D. Br. at 15-16), is also misplaced.  In those cases, the plaintiffs may have referenced the word "discriminate," but did not connect it to a particular protected category and employment practice.   Here, Dr. Pace was very clearly complaining of <u>pregnancy</u> discrimination related to her <u>change to hourly pay</u>.  (56.1 ¶¶ 29, 78).

Simply put, all of Defendants' arguments on this point are disputed, none of their cited cases are on point, and the context surrounding the October 16th email support a finding of protected activity.  *See Van Brunt-Piehler v. Absolute Software, Inc.*, 504 F. Supp. 3d 175, 190 (W.D.N.Y. 2020) (holding that plaintiff engaged in protected activity, despite not using "the magic words 'gender discrimination,' because viewed in context – which included evidence of an anti-female culture – "it is not surprising that Plaintiff did not use the specific words").

iii.    <u>The October 21, 2019 Email</u>

Again, taking all inference in Dr. Pace's favor – as is required on summary judgment motion – the October 21st email also constitutes protected activity both on its face and when considering the surrounding context.  Dr. Pace had just complained of pregnancy discrimination three days earlier.  (56.1 ¶ 78).  When she was informed that – instead of using the timekeeping system to track her hours like all other employees and per Company policy – Ms. Sousa was going to manually track them, she emailed Mr. Hebert: "I'm ***already frustrated*** enough with the situation, and would appreciate the ***same treatment as all of your other hourly employees*** – doctors included."  (*Id.* ¶ 83 (emphasis added)).

14

Her plea to be treated the same – after expressing her continued frustration with the compensation change (which she had just complained about in relation to her pregnancy) – support a finding of a second instance of protected activity.  *See Van Brunt-Piehler*, 504 F. Supp. 3d at 194 (plaintiff's complaint that she "was being treated differently than her peers" – without referencing her male peers specifically, was sufficient to constitute protected activity).

iv.   January 2, 2020 Formal Request for Accommodations

Next, Dr. Pace's submission of a doctor's note requesting accommodations on January 2, 2020 – like her request for breaks in mid-September 2019 when she first told upper management she was pregnant – also constitutes protected activity.  (*Id.* ¶¶ 89-90).  *See supra* Point II.A.1.i.

v.   January 10, 2020 Email Requesting to Come Back to Work with Accommodations

Finally, Dr. Pace's request in her January 10, 2020 email, that she be able to come back to work with restrictions, is also protected activity. (*Id.* ¶103).  *See supra* Point II.A.1.i.

**2.   Defendants Knew of Dr. Pace's Protected Activity**

It is undisputed that Defendants knew about Dr. Pace's: (1) mid-September request for breaks in relation to her new pregnancy; (2) October 16, 2019 email, where she complained about the change to her compensation structure; (3) October 21, 2019 email, where she asked to be treated the same as other hourly employees with respect to access to Paylocity; (4) request for formal accommodations for her pregnancy on January 2, 2020; and (5) follow-up email on January 10, 2020.  (*Id.* ¶¶ 67, 69, 78, 83, 89-90, 103).

**3.   Dr. Pace Experienced Six Adverse Actions**

The standard for what constitutes an "adverse action" is minimal: "an action that 'well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Bader v. Special Metals Corp.*, 985 F. Supp. 2d 291, 323 (N.D.N.Y. 2013).

15

Here, Defendants inflicted six adverse actions on Dr. Pace after her first instance of protected activity, most of which are undisputed: (1) change in pay structure from salaried to hourly; (2) their failure to investigate her complaints of pregnancy discrimination; (3) removal of management responsibilities; (4) the initial requirement that Ms. Sousa track her hours instead of using Defendants' timekeeping system like everyone else; (5) her suspension without pay; and (6) her termination.  (*Id,* ¶¶ 70, 79-80, 82, 85, 99, 107-08).  All rise to the level of "adverse action" under the law.  *See, e.g.*, *Gregory v. Daly*, 243 F.3d 687, 701 (2d Cir. 2001), *as amended* (Apr. 20, 2001) (pay changes, termination, harassing behavior); *Bader*, 985 F. Supp. 2d at 306, 323 (suspension, demotion, and constructive discharge); *Magill v. Precision Sys. Mfg.*, No. 5:01 Civ. 1482, 2006 WL 468212, at *4 (N.D.N.Y. Feb. 27, 2006) (failure to adequately investigate plaintiff's complaints of discrimination).  *C.f. Hicks v. Baines*, 593 F.3d 159, 165 (2d Cir. 2010) ("In determining whether conduct amounts to an adverse employment action, the alleged acts of retaliation need to be considered both separately and in the aggregate, as even minor acts of retaliation can be sufficiently 'substantial in gross' as to be actionable.").

### 4.     The Evidence of a Causal Connection Is Substantial

To prove a causal connection, a plaintiff must show one of three factors were present: "(1) direct proof of retaliatory animus directed against the plaintiff; (2) disparate treatment of similarly situated employees; or (3) that the retaliatory action occurred close in time to the protected activities." *McNair v. NYC Health & Hosp. Co.*, 160 F. Supp. 2d 601, 605 (S.D.N.Y. 2001).  All three exist here.

First, there is direct proof of retaliatory animus directed against Dr. Pace.  When Dr. Pace started needing to take extra breaks, instead of reporting this to management and/or placing those

16

breaks in the system, Ms. Sousa told her she would keep that fact between them because "they probably wouldn't be okay with that." (56.1 ¶ 68).

Second, there is disparate treatment of similarly situated employees. After Defendants decided to change Dr. Pace's compensation structure to hourly, they initially decided that Ms. Sousa would track Dr. Pace's hours instead of her using the employee timekeeping system like everyone else and in violation of the Company's Timecard/Time Entry policy. (*Id.* ¶ 82). Only when Dr. Pace objected to being treated differently than other staff did the Clinic give Dr. Pace access to log her own hours. (*Id.* ¶¶ 83-84).

Third, there is very close temporal proximity between Dr. Pace's protected activities and the adverse actions – not the almost three months Defendants' claim in their moving brief. (D. Br. at 17-20).[4] Dr. Pace requested pregnancy accommodations in mid-September 2019, and in only around <u>one month</u>, her compensation structure changed from salary to hourly. (56.1 ¶¶ 69-70). Then, when she complained about discrimination for the first time on October 16, 2019, Mr. Hebert dismissed her concerns without any legitimate investigation and removed her management responsibilities via an email sent <u>two days later</u>, and decided that Dr. Pace couldn't track her own hours via the employee timekeeping system <u>less than a week</u> after that. (*Id.* ¶¶ 79-83). Dr. Pace submitted a formal request for accommodations on January 2, 2020, she was suspended without pay <u>the very next day</u>. (*Id.* ¶¶ 89-90, 99). Finally, after sending her January

---

[4] For this reason, Defendants' four cited cases on this point (D. Br. at 18) are all distinguishable because in those cases, there was a 3-month gap <u>and</u> no additional evidence of retaliatory animus – unlike what exists here. Moreover, there is no bright line rule regarding temporal proximity. Courts have discretion in each case to "'exercise judgment about the permissible inferences that can be drawn from temporal proximity.'" *Guzman v. News Corp.*, No. 09 Civ. 09323 (LGS), 2013 WL 5807058, at *20 (S.D.N.Y. Oct. 28, 2013) (quoting *Summa v. Hofstra Univ.*, 708 F.3d 115, 127-28 (2d Cir.2013) (causation established with a 7-month temporal proximity).

10, 2020 email asking to come back to work with accommodations, she was terminated three days later. (*Id.* ¶¶ 103, 108).[5]

**B.     There Is Abundant Evidence of Pretext**

Even if the Court determines that Defendants offered legitimate reasons for the adverse actions taken against Dr. Pace, it should still deny summary judgment based on pretext.

First, the reasons set forth in the termination letter are simply untrue.  Dr. Pace was not a no/call-no show, and she neither acted professionally when she left the January 3rd meeting (after checking to make sure her schedule was covered), or in failing to update thirty-plus records into the electronic software system. The only reason they were not entered was because Dr. Pace was forcibly suspended and could no longer do so.  (*Id.* ¶¶ 109-113).  This, in combination with the evidence put forth in Plaintiff's prima facie case (extremely close temporal proximity plus direct evidence of retaliatory animus, *see* Point II.A.4), is sufficient for the Court to deny summary judgment here.  *See Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 148, 120 S. Ct. 2097, 2109 (2000) ("Thus, a plaintiff's prima facie case, combined with sufficient evidence to find that the employer's asserted justification is false, may permit the trier of fact to conclude that the employer unlawfully discriminated.").

Second, when challenged on why Defendants would terminate Dr. Pace for no call/no show after receiving Dr. Pace's January 10th email, Dr. Zeh could not adequately explain why

---

[5]     To the extent the Court does not believe that the evidence that Dr. Pace proffers in support of this last element is sufficient, it is important to note that "nothing about the *McDonnell Douglas* formula requires us to ration the evidence between one stage or the other." *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 286 (3d Cir. 2000).  *See also Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 143 (2000) (stating that prima facie evidence should also be considered in determining whether pretext exists); *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 102 (2d Cir. 2001) ("A court is to examine the entire record to determine whether the plaintiff could satisfy his ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff.").

Defendants did not respond to that email (*id.* ¶¶ 103-04),[6] and then tried to shift his reasoning for the termination: "Well, the extenuating circumstances that happened in the meantime was the medical notes. That to me was the most egregious error that she made."   (*Id.* ¶112).   *See Pellegrini*, 740 F. Supp. 2d at 355 ("And while not entirely inconsistent, Koroso's testimony does create some confusion as to the timing of and basis for Sovereign's decision to terminate Pellegrini.").

Third, at the time of termination, Defendants were only aware of the "30 somewhat medical notes that weren't in." (*Id.* ¶114).  Defendants, however, continued compiling a list of the medical records they believed were missing from the electronic system even after termination and produced that list in discovery.  (*Id.* ¶ 115).  *See Weiss*, 332 F. App'x at 663 ("[P]ost-hoc explanations for a . . . decision may suggest discriminatory motive"); *Lawrence v. Nat'l Westminster Bank New Jersey*, 98 F.3d 61, 67 (3d Cir. 1996) (stating that "an after-the-fact justification" is evidence of pretext); *Richardson v. New York State Off. of Mental Health*, No. 6:11-CV-1007 (GLS)(ATB), 2014 WL 3818928, at *8 (N.D.N.Y. Aug. 4, 2014) (Sharpe, J.) ("Thus, these inconsistencies cast doubt as to whether the interrogation was part of a targeted investigation into reported wrongdoing, or whether it was merely a fishing expedition.").

Fourth, there is conflicting evidence about the events leading up to Dr. Pace's termination.  With respect to the accommodations listed in Dr. Pace's January 2, 2020 doctor's note, per Defendants' version of the facts, they were concerned with the restrictions related to toxic fumes during surgery and jarring/shaking during patient exams.  (56.1 ¶ 37).  Instead of placing Dr. Pace on paid leave so they could discuss these issues and not put Dr. Pace in danger,

---

[6]      Dr. Zeh even admitted that, Dr. Pace was legitimately under the impression that she only had the two options – to go on disability or come back without restrictions.  (Zeh. Dep. 58:19-8).

however, they only addressed the toxic fumes by requiring Dr. Pace to stop performing surgeries. Defendants did not require Plaintiff to stop seeing patients overall, so they did not actually address the jarring/shaking issue despite their claimed concern.   (*Id.*).  *See Abboud*, 341 F. Supp. 3d at 184 ("defendants' proffered rationale for placing Abboud on restrictive duty is undermined by the fact that the assignment did not prevent contact with inmates or other officers").

Moreover, there are conflicting (and confusing) versions of that January 3, 2020 meeting from Ms. Sousa herself.  According to Ms. Sousa's deposition testimony, she told Dr. Pace that management would like her to get clarification on her accommodations, and as she "was in mid sentence, [Dr. Pace] grabbed [her purse] – she said, 'Is that it? I hope my schedule is covered' and left." (*Id.* ¶ 99 n.3).  In discovery, however, Defendants produced two versions of a memorandum to file that Sousa prepared in relation to the meeting.  Both memos actually confirm Dr. Pace's recollection of the meeting – that she was given two options, come back with no restrictions or go out on disability leave – and contradict Ms. Sousa's deposition testimony. (*Id.* ¶¶97-98).  *See Tegler v. Glob. Spectrum*, 291 F. Supp. 3d 565, 592 (D.N.J. 2018) (finding of pretext where the defendants' explanations were contradicted by the record).

The memoranda, however, also contradict each other on key points:

Meeting: Friday (01-03-20)

Kate and I went upstairs to the office after her last appointment of the day. I told her that based upon her doctor's note that the company could not provide her with a schedule that met the restrictions given by her doctor's note. I spoke specifically about the safety concerns surrounding the note of no shaking or jarring movements and that under the best circumstances, with an assistant or technician holding, an animal might still knock her down. I also spoke about the safety concerns surrounding toxic chemicals and she mentioned that she was going to get a note stating surgery was acceptable. I mentioned that the chemical~s~ concern goes further than the surgical area, using ~Claro~Kennel Kare as an example. I relayed that her options were to have her doctor clear her from the restrictions of her doctor's note and continue with a full schedule or to speak to her doctor about going on disability due to the fact that we could not provide her a schedule that met the requirements of  ~the~her doctor~s~ note~.~, specifically the no shaking and jarring movements and toxic chemicals. As I started to continue the conversation about our concerns, Dr. Phelps ~She~ asked if her ~schedule~ scheduled was covered and ~I said at this time yes.  I started to speak to concerns about mental and physical stamina if she did have her doctor clear her and she said is that it and~abruptly walked out of the office and left the clinic. ~She grabbed her bags and left.~

20

(*Id.* ¶ 98).  Despite Ms. Sousa's claims that these are simply two drafts, the latter of which is more accurate (56.1 ¶ 97) – this is clearly not the case, as the second version aligns with the Defendants' position whereas the first does not.  This memorandum was clearly edited later in an obvious attempt to sanitize the conversation and conceal the Clinic's illegal retaliatory conduct.

Defendants also allegedly started discussing Dr. Pace's termination on Tuesday for no-call/no-show, despite Ms. Sousa (admittedly) telling Dr. Pace during the January 3, 2020 meeting that her schedule was covered, and knowing that Dr. Pace's appointments were, in fact, covered through that Thursday.  (*Id.* ¶¶ 100, 111).  Moreover, no one bothered to contact Dr. Pace to ask her why she was not at work – because they were looking for a fake reason to terminate her.  (*Id.* ¶¶ 102).  Ms. Sousa reached out, but only to say: "How are you doing?  I am really sorry about this" and "Do you have an idea of what you are going to do"?  (*Id.* ¶ 48).  It is preposterous for Defendants to now claim that they expected Dr. Pace to be at work after they told her – even according to Ms. Sousa's own memos – that she literally was not permitted to return to work.

Fifth, Defendants outright violated the law when, the day after Dr. Pace submitted her doctor's note requesting accommodations, Defendants refused to engage in the interactive process, suspended Dr. Pace without pay, and gave her only two options – come back without restrictions or go out on disability leave. (*Id.* ¶¶ 89-99).

Sixth, Defendants have conflicting and implausible explanations for why they changed Dr. Pace's compensation structure, which occurred within a month of finding out she was pregnant.  (56.1 ¶¶ 70-77).  *See Weiss v. JP Morgan*, 332 F. App'x 659, 663 (2d Cir. 2009) ("Inconsistent . . .  explanations for a . . . decision may suggest discriminatory motive").  Defendants claim in their moving brief that their decision "was wholly tied to the financial performance of the Greene location and Plaintiff's past performance."  (D. Br. at 13).  This

claim, however is completely belied by the record.  Defendants would like the Court to believe that in October 2019, they saw a decline in performance and acted on it promptly.  The evidence, however, proves that (1) Defendants always knew that the Greene location's revenues could not compare to the amount of revenues being generated by the other locations, (2) the revenues had been flatlining or dropping since February/March 2019, and (3) due to the increased size, additional support staff, and significantly larger clientele, the veterinarians' performance at other locations could not be fairly compared to Dr. Pace's performance at the Greene location.  It is particularly compelling that Defendants gave Dr. Pace a $25,000 raise in March 2019, before she was pregnant, even though the Greene location's revenues were already falling at that time. (56.1 ¶¶ 14-15).

Moreover, despite claiming that the compensation structure decision was "wholly" related to financial concerns, Dr. Zeh and Mr. Hebert both admitted that it also had to do directly with Dr. Pace's pregnancy.  And, although Defendants pretended that they were moving Dr. Pace to hourly to allow a schedule that better fit her needs while pregnant, what they were really doing was reducing her salary ($120,000 for a 40-hour workweek) to an hourly rate that required an already-fatigued and stressed Dr. Pace to work two hours more per week to receive the same pay – something they clearly assumed would not happen.    (56.1 ¶¶ 70-77).

Seventh, after Dr. Pace complained about pregnancy discrimination related to the compensation change in her October 16, 2019 email, the Clinic did nothing to investigate her complaints.    (56.1 ¶¶ 85).  In fact, Mr. Hebert dismissed them out of hand in his email response two days later, and then immediately retaliated against her by taking away her managerial responsibilities and directing Ms. Sousa to keep track of Dr. Pace's time (instead of allowing her to use the employee timekeeping system like everyone else and per the requirements of the

Timecards/Time Entry Policy in the handbook).  Again, Defendants pretended to do this to reduce Dr. Pace's pregnancy-related stress, but the only plausible reason for this would be to scrutinize Dr. Pace's working time while pregnant.  (56.1 ¶¶ 81-84).

For these many reasons, there is overwhelming evidence of pretext, and the Court should deny summary judgment.

## III.   THE COURT SHOULD DENY SUMMARY JUDGMENT ON DR. PACE'S CLAIMS FOR ECONOMIC DAMAGES UNDER TITLE VII AND THE NYSHRL

Defendants wrongly claim that Dr. Pace did not sufficiently mitigate her damages.  As an initial matter, "any form of money damages, including front pay, is a legal remedy to be decided by the jury under the NYSHRL." *Chisholm v. Mem'l Sloan-Kettering Cancer Ctr.*, 824 F. Supp. 2d 573, 576 (S.D.N.Y. 2011) (citing *Thomas v. iStar Fin.*, 508 F. Supp. 2d 252, 258 (S.D.N.Y. 2007), and *Epstein v. Kalvin-Miller Int'l, Inc.*, No. 96 Civ. 8158, 2000 WL 1761052, at *1 (S.D.N.Y. Nov. 29, 2000)). *See also Johnson v. Strive E. Harlem Emp. Grp.*, 2014 WL 25666, at *16-17 (S.D.N.Y. Jan. 2, 2014) (evaluating back and front pay awards determined by the jury under Title VII and NYSHRL, without comment on the propriety of the jury making that determination); *Zakre v. Norddeutsche Landesbank Girozentrale*, 541 F. Supp. 2d 555, 567 (S.D.N.Y. 2008), *decision clarified on reconsideration*, No. 03 Civ. 257, 2008 WL 2557420 (S.D.N.Y. June 26, 2008), *aff'd*, 344 F. App'x 628 (2d Cir. 2009)  (same but limited to back pay only).  Accordingly, since Court cannot reach a decision on Dr. Pace's economic damages under the NYSHRL, it must deny summary judgment on that basis alone.

Moreover, Dr. Pace did sufficiently mitigate her damages so that an award of back and front pay is available.  In order to establish proper mitigation, a "plaintiff's duty is 'not onerous,'" *Antoine v. Brooklyn Maids 26, Inc.*, 489 F. Supp. 3d 68, 93 (E.D.N.Y. 2020) (quoting *Dailey v. Societe Generale*, 108 F.3d 451, 456 (2d Cir. 1997)), and it is Defendants' burden to

"demonstrate[e] that suitable work existed and that the plaintiff failed to make reasonable efforts to obtain it." *Quinn-Nolan v. Schulte, Roth & Zabel*, No. 00 Civ. 7936 (SHS), 2002 WL 1758920, at *5 (S.D.N.Y. July 30, 2002). Here, Defendants have not met their burden because they have not demonstrated that any other work – much less suitable work (besides the position at The Cat Doctor that Dr. Pace took) – existed. Accordingly, the Court should deny summary judgment on this basis alone.

In any event, despite Defendants claims to the contrary, Dr. Pace did reasonably attempt to mitigate her damages. (D. Br. at 22-25). Defendants misrepresent Plaintiff's testimony regarding her position at The Cat Doctor. The offer contemplated that Dr. Pace would eventually be full-time, but at the beginning, Dr. Sobol could only offer an open-ended number of hours on account of Dr. Pace's pregnancy and what the business could support. Dr. Sobol promised Dr. Pace that as more business came in, she could "progressively do more and more hours." Dr. Pace now works between 26 and 36 hours per week and is paid $45 dollars an hour with an additional 22 percent commission on revenue generated. (56.1 ¶¶ 58-63).

Dr. Pace's acceptance of a position at the Cat Doctor was reasonable, especially on account of her being seven months' pregnant at the time. *See Hall v. Fam. Care Home Visiting Nurse & Home Care Agency, LLC*, No. 3:07 Civ. 0911 (JCH), 2010 WL 1487871, at *2 (D. Conn. Apr. 12, 2010) ("During the time period Hall alleges she was searching for work outside the home, she was pregnant with twins, or had newborn twins. Considering an employee's limited obligation to mitigate damages, . . .as well as the potential limitations in finding employment Hall's pregnancy and childcare issues may have caused, this court believes that a reasonable jury could find that Hall's efforts to find work were reasonable."); *Antoine*, 489 F.

Supp. 3d at 93 (finding sufficient mitigation and considering how plaintiff's pregnancy and newborn child affected her ability to find work).

Accordingly, the Court should deny summary judgment on this basis as well.

## **CONCLUSION**

For the forgoing reasons, Plaintiff respectfully requests that Defendants' motion for partial summary judgment be denied in all respects.

Dated: June 29, 2021
        New York, New York                          Respectfully submitted,

                                                    **WIGDOR LLP**

                                           By:   _____
                                                    Michael J. Willemin
                                                    Christine L. Hogan

                                                    85 Fifth Avenue
                                                    New York, NY 10003
                                                    Telephone: (212) 257-6800
                                                    Facsimile: (212) 257-6845
                                                    mwillemin@wigdorlaw.com
                                                    chogan@wigdorlaw.com

                                                    *Counsel for Plaintiff*